# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CR-0102-CVE |
| | ) | |
| | ) | |
| MICHAEL LAMONT PHILLIPS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is defendant Michael Lamont Phillips's motion to suppress evidence (Dkt. # 19), as well as a supplement to his motion containing a compact disc (CD) with officer body-cam footage (Dkt. ## 26-27). Defendant is charged by indictment with one count of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). Dkt. # 2. Defendant seeks to suppress the two handguns that Tulsa Police Department (TPD) officers recovered during a dispatch call reporting a shot heard and pointing of a deadly weapon in progress (PDWIP), arguing that the officers' initial detainment of defendant and subsequent search of the vehicle that defendant was driving are not justified under, and do not fall within any exception to, the warrant requirement. Dkt. # 19. Plaintiff filed a response, arguing that the officers had reasonable suspicion to detain defendant and that the search of the vehicle was justified based on (1) the owner's consent and (2) the automobile exception to the warrant requirement. Dkt. # 25. Pursuant to the Court's direction, both parties filed supplemental briefs. See Dkt. ## 30, 31, 34. On August 7, 2018, the Court held an evidentiary hearing on defendant's motion, at which TPD Officer Charles Ramsey and TPD Detective Linda Hanna testified. See Dkt. # 41. On August 13, 2018,

plaintiff filed a motion to supplement with additional briefing (Dkt. # 42), which the Court denied (Dkt. # 43).

**I.**

The testimonies of Officer Ramsey and Detective Hanna as to the events of the evening of March 17, 2018 are summarized below and, where appropriate, are supplemented by reference to the police reports, radio logs, and body-cam footage. See Dkt. ## 19-1, 19-2, 19-3, 27. The Court considers the body-cam footage to be essential to understanding fully the danger and tension surrounding the events of that evening. See Dkt. # 27.

Officer Ramsey has been a patrol officer with TPD since 2007 and is currently, and at all times relevant to the instant matter was, assigned to the North Side, Gilcrease Division. He estimates that he has conducted over one thousand vehicle stops and several hundred vehicle searches. In addition, Officer Ramsey has training in and experience with conducting high-risk vehicle stops, which he defines as any stop that might endanger citizens, the detainee, or officers. In determining whether a stop is high risk, TPD officers consider whether the 911 call involves a violent crime, shots fired or heard, or pointing of deadly weapons. Officer Ramsey testified that, when performing high-risk vehicle stops, TPD trained him not to approach the vehicle but, instead, to convene as many officers as possible for safety purposes, exit his patrol car with his weapon drawn, command the detainee to exit the vehicle and come toward the officer(s), and place the detainee in custody pending investigation.

At 1:32:37 a.m. on March 17, 2018, Computer Assisted Dispatch (CAD) advised that a 911 caller at 343 East Young Street in Tulsa, Oklahoma had reported a shot heard to the west. Dkt. # 19-2, at 2. Officer Ramsey was dispatched to the scene at approximately 1:33 a.m. Dkt. # 19-2, at

2

2. Officer Ramsey testified on cross examination that officers in a police helicopter had mentioned that a white four-door sedan was sitting at the scene. Shortly before Officer Ramsey arrived, officers in the police helicopter reported over the police radio that they saw an object either fall out of or off the vehicle. When Officer Ramsey turned onto East Young Street, he observed a white four-door sedan stopped in the middle of the street roughly in front of 343 East Young Street (the radio report indicates that Officer Ramsey arrived on the scene at approximately 1:37 a.m. Dkt. # 19-2, at 2). As Officer Ramsey approached the vehicle, which was approximately half a block away from him, the vehicle began moving eastbound down East Young Street, away from Officer Ramsey's patrol car. At 1:38:59 a.m., CAD advised that the 911 caller had called back to further report that "CALLER FROM PDWIP CALL POSS PUT SOMETHING UNDERNEATH THE WHI CHEVY MALIBU ON YOUNG ST, THEN STARTED WALKING EB."[1] Dkt. # 19-2, at 2. Although Officer Ramsey had not identified the make and model of the white sedan as he was tailing it, he testified that it is very common for 911 callers, especially at night, to mistake the make and model of a vehicle (he added that East Young Street is not well lit). Over the course of the encounter, Officer Ramsey would learn that the white sedan was a 2005 Toyota Camry and that defendant was driving the vehicle with passenger Kashanda Brown, his girlfriend and the vehicle's owner. As Officer Ramsey followed the white sedan, the vehicle made a loop around the block and then returned to East Young Street. At 1:40:07 a.m., the driver of the white sedan stopped mid-block on East Young Street and turned on his turn signal. Dkt. # 19-2, at 2. At that point, Officer Ramsey activated his emergency lights (body-cam footage indicates that the white sedan was still

---

[1] On cross examination, Officer Ramsey testified that he does not recall whether he saw the CAD update reporting that a person had exited a white Chevy Malibu and started walking eastbound.

3

pulling into the driveway approximately five seconds after Officer Ramsey had activated his the emergency lights. Dkt. # 27-file name beginning in qba01225, at 00:30-00:35). Officer Ramsey testified that he did not pull the vehicle over prior to the driver turning on the turn signal because, due to the nature of the 911 call, he determined it was a high-risk traffic stop and was therefore waiting for backup.

Defendant parked the white sedan in the middle of an unenclosed driveway in front of the garage door of a single-story home at 334 East Young Street. When defendant opened the driver's side door of the vehicle, Officer Ramsey exited his patrol car with his gun drawn and commanded defendant to stay in the vehicle, which defendant did not do. Dkt. # 27-file name beginning in qba01225, at 00:47. At this point, Officer Ramsey was the only officer at the scene and he had no knowledge as to whose residence this was. While waiting for backup to arrive, Officer Ramsey, who was standing where the driveway meets the sidewalk, engaged in a standoff with defendant, who was standing mid-driveway, lasting approximately five minutes. See Dkt. # 27-file name beginning in qba01225, at 00:46-05:11. Officer Ramsey asked defendant to come speak with him, which defendant refused to do. Defendant made repeated and profane verbal and gesticular protestations, asserting that he was "at home." Dkt. # 27-file name beginning in qba01225, at 00:54. Officer Ramsey explained that he was conducting an investigation and commanded defendant to put his hands up, which defendant did not do. Dkt. # 27-file name beginning in qba01225, at 01:01. Officer Ramsey testified that, due to the nature of the 911 call, he believed that a weapon might be involved and, therefore, he feared for his safety when defendant reached his hands into his pockets twice—and, at one point, grabbed an item from his pocket and tossed it to Brown—despite Officer Ramsey's numerous emphatic commands not to do so. Detective Hanna, who had arrived on the

4

scene just a few minutes earlier at approximately 1:42 a.m. (Dkt. # 19-2, at 2), also drew her weapon upon seeing defendant put his hands in his pockets and commanded defendant not to do so, out of concern for officer safety. In addition, Detective Hanna, who has twenty-three years of law enforcement experience (including as a domestic violence detective) and has conducted over one hundred high-risk vehicle stops, corroborated Officer Ramsey's testimony describing that interaction (including that defendant failed to respond to Officer Ramsey's commands or requests to talk).

Shortly thereafter, Officer Ramsey radioed for less-lethal backup (Dkt. # 27-file name beginning in qba01225, at 02:49), and Officer Pablo Zuniga arrived equipped with a Taser. When he arrived, Officers Ramsey and Zuniga and Detective Hanna approached defendant in the driveway and handcuffed him. At that point, Officer Ramsey and Detective Hanna each formed the belief that defendant was intoxicated, due to a strong odor of alcohol. Officer Ramsey performed a protective search of defendant and recovered an open, small clear bottle of alcohol on defendant's person. Officer Ramsey then placed defendant in the back of a patrol car pending investigation . As Detective Hanna's report states, after defendant was detained in the patrol car, it was discovered that he had outstanding warrants. Dkt. # 19-3, at 1.

With defendant now detained in a patrol car, Officer Ramsey approached Brown, who had exited the vehicle during the standoff, entered the home, and returned to the driveway next to the vehicle. Brown was visibly upset and shaking. Officer Ramsey asked her what was going on, and she stated that she really wanted to tell him but that she was "scared" to and "d[id not] want to put [her]self in danger." Dkt. # 27-file name beginning in qba01225, at 07:47. Officer Ramsey asked Brown whether defendant had thrown a gun out of the car window. Brown responded that she did not know, and that she had "jumped in the car" because defendant "tried to take off in [her] car

5

again." Dkt. # 27-file name beginning in qba01225, at 8:00-8:05. At that point, Officer Ramsey stated, "It looks like it's an abusive relationship. Is that what's going on?," to which Brown responded that she did not want to say anything. Dkt. # 27-file name beginning in qba01225, at 8:14-8:17. Officer Ramsey explained that he wanted to "make sure there [was] not a firearm on the street that a little kid could get and hurt himself." Dkt. # 27-file name beginning in qba01225, at 8:22-8:25.

Officer Ramsey noticed that the vehicle's front windshield was shattered on the passenger's side and that there were large dents along the front passenger fender. In his opinion, the damage was fresh. Brown confirmed that the vehicle belonged to her. As Brown started to calm down, she indicated that there had been an altercation that evening, that several other people had been present, and that they "were all yelling for help." Dkt. # 27-file name beginning in qba01225, at 8:59-9:03. While Officer Ramsey was speaking to Brown, the officers in the police helicopter stated over the radio that the object they saw either fall out of or off the vehicle at the scene was a cinder block. Dkt. # 27-file name beginning in qba01225, at 9:09.

Officer Ramsey asked Brown whether he would find a firearm in the car when he searched it. Brown, who once again started shaking and crying, said "I don't know, but can you please not do it in front of him?" Dkt. # 27-file name beginning in qba01225, at 10:55-11:03. Shortly thereafter, Detective Hanna joined the conversation. Detective Hanna also noticed the damage to the windshield, and testified that the damage looked recent as the glass was still crackling. Detective Hanna asked Officer Ramsey whether it was caused by the cinder block, and Officer Ramsey confirmed that it was. Dkt. # 27-file name beginning in qba01225, at 12:33. In discussing the damage to the vehicle, Brown stated that defendant had been with other women that evening and that

one of those women had caused the damage to her car. Dkt. # 27-file name beginning in qba01225, at 12:57. Brown again stated that the car belongs to her and added that she is still paying for it. Dkt. # 27-file name beginning in qba01225, at 13:06-13:08. Detective Hanna noted to Officer Ramsey that she could see an open beer can in the vehicle. Officer Ramsey began to explain to Detective Hanna that Brown was hesitant to talk about what had happened that evening, at which point Brown interjected, "I'm not hesitant; I'm scared." Dkt. # 27-file name beginning in qba01225, at 12:30. Officer Ramsey explained to Detective Hanna that Brown is "scared" of defendant and, therefore, she does not want the officers looking through the car while defendant can see. Dkt. # 27-file name beginning in qba01225, at 13:16. Detective Hanna suggested that they move defendant, who was sitting in a patrol car at the curb, a short distance away from the group. Dkt. # 27-file name beginning in qba01225, at 13:18. Officer Ramsey agreed and said, "We aren't going to do anything to put her in danger." Dkt. # 27-file name beginning in qba01225, at 13:22.

Shortly thereafter, Detective Hanna and Brown briefly talked away from Officer Ramsey. Detective Hanna testified that she had obtained consent to search Brown's vehicle by asking Brown for permission. After speaking to Brown, Detective Hanna asked Officer Ramsey to stand in front of the vehicle to block defendant's view of it because Detective Hanna was going to search it. Detective Hanna explained that Brown was going to leave the car keys on the vehicle's hood so that defendant would not see Brown hand the keys to Detective Hanna. Brown walked over to defendant to distract him. Approximately thirty seconds after Detective Hanna began her search, however, Brown ran back toward her and yelled for the officers to pull defendant away from the area because he could see Detective Hanna searching the vehicle. Dkt. # 27-file name beginning in qba01225, at 16:22. Brown began crying and yelling that defendant was "going to murder" Detective Hanna

7

because "he just saw her in the car." Dkt. # 27-file name beginning in qba01225, at 16:29. In response, Officer Ramsey and Detective Hanna decided to have Officer Zuniga drive the patrol car in which defendant was detained around the corner. Once defendant could no longer see the vehicle, Detective Hanna continued her search and, within about ten to fifteen seconds, saw and recovered a pistol from the area between the console and the driver's seat. In addition, Brown informed the officers that there was a second pistol in the trunk, which she said belonged to defendant but which she had hidden from him. The Court finds that both witnesses were credible.

## II.

In his motion to suppress, defendant argues that: (1) Officer Ramsey's initial detention of him was unreasonable because Officer Ramsey did not observe defendant commit a traffic violation and, thus, it became a custodial detention; and (2) the officers' search of the vehicle was unreasonable because: (i) they did not have probable cause to believe evidence of a crime existed within the vehicle (as Officer Ramsey had no reason to believe defendant was involved with the shot fired), (ii) there were no exigent circumstances to believe that evidence of a crime would be hidden or destroyed because there was no probable cause to believe defendant was involved with the shot fired call, and (iii) it was not a valid search incident to arrest because, at the time of the search, defendant was secured, and—because defendant was arrested for an unrelated outstanding warrant—there was no reason to believe that evidence relevant to the crime of arrest might be found in the vehicle. Dkt. # 19, at 3-9.[2]

---

2 Although neither party cited <u>Collins v. Virginia</u>, 138 S. Ct. 1663 (2018), the Court directed the parties to file supplemental briefs addressing the impact of <u>Collins</u>, if any, on defendant's motion to suppress. <u>See</u> Dkt. # 30. In his supplemental brief, defendant argues that the vehicle was located on the curtilage of the home and, thus, the automobile exception cannot
(continued...)

In response, plaintiff argues that: (1) Officer Ramsey had reasonable suspicion to stop the vehicle because the 911 call log reported that a white Malibu was involved in the incident and Officer Ramsey saw defendant driving a "white sedan" near where the shot was reportedly fired, then drive in a circle and end up at the same address where he started; (2) the automobile exception authorized the search because the officers had probable cause to believe that defendant was driving with an open container of alcohol and driving under the influence, and therefore could lawfully search every location in the vehicle where evidence of these crimes might be found;[3] and (3) Brown consented to the search. Dkt. # 25, at 4-10.[4]

---

[2] (...continued)
justify the officers' search of the vehicle. Dkt. # 31, at 2-4. Defendant further argues that, assuming the vehicle was located on the curtilage, Brown's consent to the search of her vehicle is invalid due to defendant's implied objection to the search under Georgia v. Randolph, 547 U.S. 103 (2006). Dkt. # 31, at 4-5. At the hearing on August 7, 2018, defendant raised the additional argument in closing that the officers moved defendant away from the scene so that he could not object to the search.

Assuming without deciding that Collins, even though it was decided after the search in this case took place, could apply retroactively to this case (which this Court does not reach), see generally Davis v. United States, 564 U.S. 229, 249 (2011); United States v. Madden, 682 F.3d 920, 926 (10th Cir. 2012), the Court finds that Collins is nevertheless inapposite. In Collins, the Supreme Court held that the automobile exception to the warrant requirement does not permit the warrantless entry onto the curtilage of a home in order to search a vehicle therein. Collins, 138 S. Ct. at 1673. However, Collins is inapplicable here because Brown's vehicle was not within the curtilage of her residence when the officers searched it; unlike the vehicle in Collins, when the officers searched Brown's vehicle it was parked in the middle of an unenclosed driveway ramp that was used to access the home and entirely exposed to public view, to which "a neighbor would venture" and home life cannot reasonably extend. Id. at 1673 n.3.

[3] The Court rejects plaintiff's argument that the search was made pursuant to the automobile exception, because defendant was arrested based on outstanding warrants, as opposed to a crime related to intoxication.

[4] In filing its motion to supplement with additional briefing (Dkt. # 42), plaintiff sought to address (1) the impact of Byrd v. United States, 138 S. Ct. 1518 (2018), on defendant's claim of Fourth Amendment standing to move to suppress evidence found in the Toyota Camry,
(continued...)

**III.**

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio,

---

[4] (...continued)
and (2) the impact of Officer Ramsey's testimony that he initiated the traffic stop while he and defendant were still on the public street on defendant's claim that the officers trespassed when they detained him on the driveway. Dkt. # 42, at 1-2. As to standing, unlike the Byrd plaintiff, plaintiff has not argued that defendant lacks standing to move to suppress the evidence found in the vehicle search; plaintiff argues only that the search is valid based on Brown's consent (and the automobile exception to the warrant requirement, which the Court has rejected). Thus, assuming defendant was in lawful possession of the vehicle, there is no dispute that defendant had a reasonable expectation of privacy in the vehicle he was driving, and it is a nonissue that he has standing to move to suppress the firearms found therein. The Byrd decision, which holds that a person in lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver, is therefore not relevant. Byrd, 138 S. Ct. At 1524. The Court notes that it is not clear that defendant was in lawful possession of Brown's vehicle in light of Brown's statement that defendant was trying "to take off in [her] car again"; however, that issue does not ultimately impact the Court's conclusion for the reasons discussed below in III. B. Thus, because plaintiff does not dispute defendant's lawful possession of the vehicle, the Court assumes without deciding that defendant was in lawful possession of Brown's vehicle. As to trespass, defendant does not argue that the officers trespassed when they entered the driveway; rather, defendant argues that the officers violated his rights under the Fourth Amendment, and "the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." Oliver v. United States, 466 U.S. 183-84 (1984); see Rieck v. Jensen, 651 F.3d 1188, 1191 (10th Cir. 2011) (stating that "the Supreme Court has made it clear that the Fourth Amendment does not track property law"). In any case, "the courts of Oklahoma have considered police officers trespassers only where they have entered property without proper legal authority to do so." Lawmaster v. Ward, 125 F.3d 1341, 1352 (10th Cir. 1997) (holding that the officers did not trespass when they entered the property with a valid search warrant). As discussed herein, the Court finds that the officers had legal authority, pursuant to an implied license, to enter the non-curtilage portion of the property to effectuate an investigative detention in connection with a report of a shot heard and pointing of a deadly weapon. See United States v. Carloss, 818 F.3d 988 (10th Cir. 2016) ("[T]he implied license recognized in [Florida v. ]Jardines[, 569 U.S. 1 (2013)] . . . allows police officers, like members of the public, to approach the front door of a home . . . .").

392 U.S. 1, 16 (1968). "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).

A.  Initial Detention of Defendant

Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported by a reasonable, articulable suspicion that the detained individual is engaged in criminal activity. Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007). "Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993). Although the investigative detention must be "justified at its inception and reasonably limited in scope," United States v. Rice, 483 F.3d 1079, 1082 (10th Cir. 2007), "[t]he allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; 'common sense and ordinary human experience must govern over rigid criteria,'" United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002) (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

Prior to encountering defendant, Officer Ramsey had received information that a 911 caller located at 343 East Young Street reported a shot heard, that the officers in the police helicopter saw something thrown from or off a vehicle in that location, and that the vehicle was described as a white four-door sedan. When Officer Ramsey arrived on East Young Street, he observed from down the block a vehicle matching the description provided (i.e., a white sedan) stopped in the middle of the road roughly in front of 343 East Young Street—the address from which the shot-heard 911 call

11

came.  As Officer Ramsey approached the vehicle in his patrol car, defendant, who was in the driver's seat of the white sedan, began to drive away.  Officer Ramsey followed the white sedan and observed defendant make a series of turns and then return to the area of the reported shot heard.  While Officer Ramsey was tailing the white sedan, additional information appeared on the CAD screen regarding pointing of a deadly weapon and a further description of the vehicle as a white Chevy Malibu; however, as Officer Ramsey testified, 911 callers often mistake the make and model of vehicles, especially in areas that are not well lit, like East Young Street.  Defendant began to stop the car in the middle of the block, at which point Officer Ramsey activated his emergency lights.  In light of the fact that Officer Ramsey observed defendant sitting in a vehicle that matched the size, color, and location of the vehicle described in connection with a reported shot heard, and then observed defendant drive around the block upon Officer Ramsey's arrival, the Court finds that Officer Ramsey had a reasonable, articulable suspicion that defendant was engaged in criminal activity and, therefore, lawfully initiated an investigative detention of defendant.

Further, the Court finds that the investigative detention did not become a custodial detention until the officers discovered defendant's outstanding warrants.  Officer Ramsey drew his weapon when he exited his patrol vehicle; however, "the 'use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" Neff, 300 F.3d at 1220 (quoting United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)). Moreover, an investigative detention "does not become unreasonable just because police officers used handcuffs on a subject . . . ." Id.  Rather, "the use of handcuffs [i]s appropriate as long as there [i]s a reasonable, articulable ground for fearing danger from the suspects." Id. at 1221 (citing United States v. Shareef, 100 F.3d 1491, 1506 (10th Cir. 1996)).  As Officer Ramsey testified, he believed

a weapon might be involved, which was reasonable in light of the fact that he was responding to reports of a shot heard and pointing of a deadly weapon. Moreover, Officer Ramsey did not have any reason to know whose driveway defendant had pulled into or why he had pulled into it after Officer Ramsey had already activated his emergency lights. He did not know whether defendant was going to run inside the house and he did not know who was inside the house. Therefore, when defendant opened the driver's side door and exited the vehicle despite Officer Ramsey's clear commands to stay in the vehicle, Officer Ramsey exited his patrol car with his weapon drawn. Under these circumstances, the Court finds Officer Ramsey reasonably believed his weapon was necessary for his protection and, thus, it was permissible for him to draw his weapon in connection with the investigative detention.

In addition, over the course of the five minute conversation, defendant refused to comply with every one of the officers' requests and commands. Officer Ramsey asked defendant to come towards him, yet defendant refused to do so. Officer Ramsey explained that he was conducting an investigation and asked defendant to speak to him, but defendant refused and, instead, repeatedly made profane verbal and gesticular protestations. Officer Ramsey commanded defendant to put his hands up numerous times, yet defendant refused to do so. Officer Ramsey commanded defendant not to put his hands in his pockets, yet defendant reached into his pockets twice and, at one point, even grabbed an item from his pocket and tossed it to Brown. As Officer Ramsey and Detective Hanna both testified, they feared for their safety at the moment when defendant reached into his pockets. In Neff, the Tenth Circuit held that officers had reason to fear someone who was reported to be carrying an unlawful weapon and that they had a sound basis for handcuffing the suspect until the weapon was recovered. Here, defendant—a suspect in the officers' investigation into reports

13

of a shot heard and pointing of a deadly weapon—failed repeatedly to comply with the officers' requests and took actions that caused the officers to fear for their safety and the safety of others. Thus, the officers had reasonable, articulable grounds to handcuff defendant and place him in a nearby patrol car during the investigative detention.[5] And, once it was discovered that defendant had outstanding warrants, TPD officers lawfully arrested him. See Utah v. Strieff, 136 S. Ct. 2056, 2063 (2016) ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'" (quoting United States v. Leon, 468 U.S. 897, 920 n.21 (1984))).

### B. The Search of the Vehicle

The Court finds further that Brown voluntarily consented to Officer Ramsey and Detective Hanna searching her vehicle. "[A] search authorized by consent is wholly valid." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); see also United States v. Rosborough, 366 F.3d 1145, 1149 (10th Cir. 2004) ("A general grant of permission to search an automobile typically extends to the entire car . . . ."). Whether an individual voluntarily consents to the search of their vehicle "is a question of fact based on the totality of the circumstances." Rosborough, 366 F.3d at 1149. The Tenth Circuit considers "whether the officer's conduct constituted a coercive show of authority, such that a reasonable person would believe he was not free to decline the officer's requests or otherwise terminate the encounter." Id. (quotation omitted).

---

[5] Although the Court does not find that defendant was arrested when handcuffed, it should be noted that a suspect's failure to obey a police command can furnish officers with the reasonable belief that an offense is being committed, and thus provide probable cause for an arrest, because failure to obey a police command, in some circumstances, is itself a criminal offense. See e.g., Mocek v. City of Albuqurque, 813 F.3d 912, 928-29 (10th Cir. 2015); United States v. Wise, 597 F.3d 1141, 1143 (10th Cir. 2010).

Prior to conducting a search of the vehicle, Brown confirmed several times to Officer Ramsey and Detective Hanna that she is the owner of the vehicle. Further, Brown repeatedly made it clear to the officers that she wanted to tell them what had happened that night and that she wanted them to search her vehicle, but that she was "scared" of defendant (as evidenced by the fact that she later informed the officers that she hid one of his firearms under several layers in the trunk of her car). Thus, the only thing that Brown did not want in relation to the search was for defendant to see her assisting the officers in effectuating it. And to that end, Brown actively collaborated with Detective Hanna and Officer Ramsey to devise a way for the officers to gain access to the vehicle without defendant seeing Brown hand them the keys or Detective Hanna conducting the search.[6] Thus, the Court finds that Brown consented to the officers' search of her vehicle, in which they discovered defendant's firearms.

Further, the Court finds that Brown's consent to the search of her vehicle is not vitiated by defendant's removal from the area or his implied objection to the search, regardless of whether or not defendant was in lawful possession of the vehicle. If, in fact, defendant was trying to "take off in [Brown's] car" and, thus, driving the vehicle without Brown's permission (which the Court does not decide), then defendant does not have a reasonable expectation of privacy in the vehicle and his consent is not required for the officers to search it. See Byrd, 138 U.S. at 1529 ("No matter the

---

[6] Even assuming, arguendo, that defendant was detained in violation of his Fourth Amendment rights (although this Court has found he was not), Brown's consent would still have provided the officers a legal basis upon which to search the vehicle because her consent was voluntary and constituted an intervening circumstance sufficiently attenuated from defendant's detention. See United States v. Fox, 600 F.3d 1253, 1257 (10th Cir. 2010) ("When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that the was a break in the causal chain between the illegality and the evidence thereby obtained.").

degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car."). But, even assuming that defendant was in lawful possession of the vehicle, the Court's conclusion that the vehicle search was valid pursuant to Brown's consent does not change. In the context of a warrantless search of a residence, "if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." Randolph, 547 U.S. at 121. "So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is a practical value in the simple clarity of complementary rules . . . ." Id.; see also United States v. McKerrell, 491 F.3d 1221, 1228 (10th Cir. 2007) (holding that the Court has "no reason to invoke Randolph's admonishment that officers may not remove a defendant from the threshold to silence his or her potential objection" where there is no evidence that the officers prevented defendant from objecting to the search or removed him from the scene for any reason other than to complete his arrest).

Applying these principles in the context of a vehicle search, and assuming without deciding that defendant was in lawful possession of the vehicle, Brown's consent to the search of her vehicle is sufficient under the Fourth Amendment even though defendant did not give his consent to the search. Defendant was "absent" during the officers' search of Brown's vehicle because he was being detained in a patrol car nearby. See Randolph, 547 U.S. at 109-10 (referring to the defendant in United States v. Matlock, 415 U.S. 164 (1974), who was detained in a squad car parked nearby during the search of his shared residence, as an "absent, nonconsenting person"). Thus, the officers did not need to take affirmative steps to seek his consent before acting on the permission they had

16

already received from Brown, so long as defendant was not removed "for the sake of avoiding a possible objection." Id. at 121. As discussed above, the reason for defendant's detention was the officers' reasonable concerns for officer safety and the safety of others. Moreover, defendant was detained prior to the officers even approaching the vehicle, asking Brown whether there was a firearm in the vehicle, or requesting Brown's consent to search it. Therefore, there is no evidence that the officers initially removed defendant to avoid a possible objection. Nor is there any evidence that the officers subsequently moved the patrol car in which defendant was being held for the purpose of avoiding a possible objection. Rather, the record indicates clearly that the officers drove defendant around the corner solely out of concern for Brown's safety. After Officer Ramsey explained to Detective Hanna (in Brown's presence) that Brown was "scared" of defendant and, therefore, she did not want the officers looking through the car while he could see, Office Ramsey told Detective Hanna they were "not going to do anything to put [Brown] in danger." In direct response to Officer Ramsey's expression of concern for Brown's safety, Detective Hanna suggested that they remove defendant from the area. And, importantly, the officers moved the defendant away from the scene only when Brown began crying and screaming fearfully that defendant was "going to murder" Detective Hanna because he could see her in the vehicle. Therefore, there is no evidence to suggest that defendant's absence or removal from the scene was for the sake of avoiding a possible objection. The Court finds that the search based on valid consent did not violate the warrant requirement.

Accordingly, the Court finds that defendant's motion to suppress (Dkt. # 19) should be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkt. # 19) is **denied**.

**DATED** this 24th day of August, 2018.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE